## THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

                Case No. 23-CR-20394

                HON. SEAN F. COX

          Plaintiff,

  -vs-

**ISAAC YOUNG**

          Defendant.

_____/

### <u>SENTENCING MEMORANDUM</u>

Now comes Mr. Isaac Young, through counsel, Robert Kinney. Mr. Young has reviewed the probation department's presentence investigation report with counsel and does not have any objections to the advisory guideline calculation. However, the defense submits that despite the advisory guideline range of 37 to 46 months, consideration of the 18 U.S.C. § 3553(a) factors warrants consideration of a sentence of time served, followed by a term of supervised release. While a sentence of time served is a significant downward variance, Mr. Young's remorse and accountability as evinced by his guilty plea, the nature and circumstances of the offense, and his personal history and characteristics, demonstrate that any time in prison would be greater than necessary to meet the ends of justice.

## I.  PROCEDURAL BACKGROUND

Mr. Young will appear before this Honorable Court for sentencing on January 29, 2025, having pled guilty to one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The maximum penalty for violation of § 922(g)(1) is 15 years of imprisonment pursuant to 18 U.S.C. § 924(a)(8). The Court may impose a maximum term of 3 years of supervised release.

Mr. Young was arrested on July 18, 2023, and following a detention hearing, was released on bond with strict conditions, home confinement and electronic GPS monitoring, on July 20, 2023.  After about six months of compliance, Pretrial Services petitioned the Court to amend Mr. Young's bond conditions to stand-alone monitoring.

Mr. Young not only admitted his guilt in open court, but it was timely enough so that the prosecution did not have to spend extensive time and effort preparing for trial. Mr. Young's bond was continued following his guilty plea, noting that he has been compliant with his bond conditions, including no positive tests for any controlled substances.

## II.  SENTENCING CONSIDERATIONS

Section 3553(a) directs courts to impose a sentence that is "sufficient, *but not greater than necessary*," to meet the goals of sentencing. Those purposes include: (1) reflecting the seriousness of the offense; (2) promoting respect for the law and

providing just punishment; (3) protecting the public; (4) deterrence; and (5) providing the defendant with educational or vocational training, medical care or other correctional treatment in the most effective manner. Under § 3553(a), courts are further directed to consider other factors including: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) need for the sentence imposed; (3) kinds of sentences available; (4) the sentencing guidelines range and any pertinent policy statement; (5) the need to avoid unwarranted sentence disparities among defendants with similar records and criminal conduct. *See* 18 U.S.C. § 3553(a). When a guideline "does not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience," the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 96, 109-10 (2007).

The United States Supreme Court decided in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005) to finally erase the mandatory nature of the guidelines and declared them advisory. As such, the guidelines are a tool for district courts to consider, rather than an edict that must be followed. In addition to the correct guideline range and any appropriate departures, district courts must also consider the 18 U.S.C. § 3553(a) factors and any appropriate variances. Then, the

district court must provide a reasonable explanation of its sentencing decision, whether within or outside of the guideline range, for appellate review of its reasonableness. *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); and *United States v. Parrish*, 915 F.3d 1043 (2019).

Under § 3553(a), the question is, with this offense and Mr. Young's history and characteristics, is imprisonment necessary to meet the goals of sentencing? The defense answers no.

### i.     <u>Nature and Circumstances of the Offense</u>

Mr. Young has admitted to possessing a firearm knowing he was a felon. However, the government—and the probation department—present an incorrect narrative of the nature and circumstance of the offense. Mr. Young was not engaged in a "shootout," as the government alleges. Mr. Young was a victim of an armed robbery and suffered severe injuries as a result.

On February 1, 2023, Mr. Young was leaving his girlfriend's apartment with a friend when they were rushed by unknown perpetrators announcing a robbery. He can't describe anyone, or say how many perpetrators were involved, because he was immediately shot several times. All he could do is crawl, bleeding, back into the apartment complex. He knocked as hard as he could on several doors trying to get help. Mr. Young was indeed carrying a firearm for his protection, and for that he has accepted responsibility. However, when the time came to use the firearm in self-

defense, when he was peppered with bullets, he couldn't use it—he was running away, trying to save his life. Fortunately, Mr. Young is still here. Later at the hospital, he learned he had been shot in leg, hand, and pelvis. Medical staff repeatedly told him he was blessed to be among the living with no paralysis or other permanent injury.

While it is true that days earlier Mr. Young was a back-seat passenger in a friend's car that was stopped by the police, that friend had a CPL. No charges came as a result of that stop. Mr. Young also denies any knowledge of who shot him or attempting to retaliate against anyone. The defense does not believe his injuries or the government's suspicions of retaliation is relevant conduct or facts that can be used to support an argument for imprisonment. This explanation, for what it's worth, does not attempt to minimize or justify the offense conduct. However, he asks that the Court balance that seriousness against his personal history, and his commitment to a new life going forward.

## ii. Mr. Young's Personal History and Characteristics

Mr. Young was born into a beautiful family, yet life turned upside down when his father learned he had lung cancer. His father died when Mr. Young was 5 years old. Mr. Young's father was truly his best friend, and he had a very difficult time with his passing.

While his mother stood strong raising her children as a single parent,

employed by the U.S. Postal Service for the last 27 years, depression still plages her till this day. She worked through this depression, always provided stability for her children and even for friends in need around the neighborhood. Mr. Young always felt the need to make things easier for her; as a young child trying to process his father's death, bitterness and frustration set in towards his father. Realistically he knew his father's death was not his fault—was not anyone's fault, but just a harsh reality of how unfair life can be—but the "why" question was never answered.

In high school, Mr. Young found an escape in basketball. He was talented and a disciplined hard worker. But he began getting into arguments with security over his extended stays in the school library and gym. The situation escalated to the point that his mother withdrew him from school. Ironically, his first conviction wasn't for truancy, but trespassing by using the gym and going to a basketball game.

He graduated from Cambridge Alternative High School in Garden City, Michigan. There he fell in love with music, rap in particular, and found solace and passion in being an artist. Mr. Young loves music and sharing his art; however, the rap life, particularly when you are trying to break into the industry, is expensive. Aside from studio time, equipment, and travel, young artists often feel a pressure to display a certain image through clothes and shoes and jewelry. He received convictions, mainly for fraud, in an effort to live up to an image he couldn't sustain at that time. The image became important, so he and classmates interested in a career

in rap came up with the name CashGang. CashGang is a group of friends who are committed to attaining wealth through rapping; it is not a dangerous street gang as the government alleges. As CashGang rose in popularity, so too did Mr. Young. It turned his life around; he became known in the neighborhood, his songs started to generate income, and he secured a lucrative recording contract. He recognized his new status and began immediately giving back to the community, sharing his art and performing for free at various charity events and festivals, including the Backwoods and Bonfires Festival in September 2023, the Milwaukee Summer Festival in 2024.

At 23 years old, when he was finding his place in the industry, his greatest nightmare came true when he became the victim of an armed robbery. The unknown perpetrators almost stole his life. Mr. Young admits responsibility for carrying a firearm; however, it was for protection. He realizes now that because he is a felon, he cannot carry a firearm no matter the intention or circumstances behind it. He is ready to make changes, such as hiring security to alleviate concerns he has as a artist with growing popularity.

It is important to remember that at the time of the offense, Mr. Young was just 23 years old. By society's standards, Mr. Young was already a grown man. However, the Supreme Court has acknowledged "what 'any parent knows'" and what research has repeatedly shown: juveniles and emerging adults are different. *Miller v. Alabama,* 567 U.S. 460, 471 (2012). Developments in brain science continue to

show fundamental differences between juvenile and adult minds, including in the parts of the brain involved in behavior control. Mariam Arain, et al., *Maturation of the Adolescent Brain,* 9 Neuro. Disease & Treatment 453 (2013). The prefrontal cortex of the brain does not reach majority until around age 25—Mr. Young's current age—and this part of the brain controls impulse control, complex decision-making, inhibition, and planning. *Id*.; *see also* U.S.S.C., *Youthful Offenders in the System*, at 5 (May 2017) (noting a voluminous body of neuroscience research "recogni[zing] that people may not gain full reasoning skills and abilities until they reach age 25 on average"); Nico U.F. Dosenbach et al., *Prediction of individual brain maturity using fMRI*, Science (Sept. 10, 2010) (longitudinal study tracking brain development in 5,000 children and finding their brains did not reach full maturity until *at least* age 25).

Studies consistently find that incarceration is itself a traumatic experience for young people, and "it can exacerbate the difficulties experienced by youth who have previous exposure to violence and other adverse childhood experiences." Richard Mendel, *Why Youth Incarceration Fails: An Updated Review of the Evidence,* The Sentencing Project (March 1, 2023). Incarcerating youth "impedes their ability to mature psychologically … [i]n other words, the purported solution (incarceration) does not address the underlying cause of the conduct (immaturity)." *Id*.

Mr. Young had not had the benefit of therapy or counseling to address the

impact of his father's death. Indeed, the negative impact of perceived parental abandonment, and instability during foundational developmental years is beyond reasonable dispute. Though prison is touted to be a place for rehabilitation, and certainly there is opportunity for programming, the inherently violent and stressful prison environment compounds the need for therapeutic intervention. To Mr. Young's credit, he began working on an impossible dream and latched on to its tail. He intends to continue his educational pursuits, which can only elevate his career by broadening his horizons.

### iii.   Sentencing Rationale: Punishment, Deterrence, Protection of the Public, and Rehabilitation

Mr. Young takes responsibility for his conduct, but a prison sentence is not appropriate in this case. With regard to individual deterrence, Mr. Young's near-death experience will deter him from engaging in illegal conduct upon release. If the Court accepts the defense's recommended sentence of time served, he will be sentenced to a term of supervised release, and he is well aware that a violation of those conditions would likely result in a term of incarceration.

In terms of general deterrence, it is nearly impossible to evaluate the impact of an individual sentence on the community. Even the Department of Justice recognizes that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment." National Institute of Justice, *Five Things about Deterrence* (Sept. 2014). So, the real fear, or likelihood of being caught, is the actual

deterrence—not the punishment of someone else.

In terms of protection of the public, the Court should first recognize that Mr. Young was a victim in this case. He was severely injured and could have lost his life. However, Mr. Young has made realizations about the far-reaching consequences of his actions throughout the pendency of his case. Unfortunately, a harsh reality of criminal activity—particularly possessing firearms as a felon—is the immature assumption that because the individual does not *see* the devastating impact of gun use on families, or because the intention behind the gun possession is self-defense, it is not as bad. The fact that Mr. Young is engaged in a new career with major opportunities evinces his ability to succeed becoming a community-based form of support for young entrepreneurs just bound to follow in his footsteps. A sentence to time served with supervised release to follow will be more beneficial and life-changing for Mr. Young and his community than a prison term.

## **CONCLUSION**

Mr. Young has come to terms with the reality that he will have to change and has shown his willingness to learn. This time abiding this courts sentence will be challenging; it will be life-changing. He is older and wiser. He views life differently now. A term greater than time served would be greater than necessary to meet the goals of sentencing.

Respectfully submitted,

/s/ *Robert F. Kinney*
Robert F. Kinney, P35842
Attorney for Mr. Young
615 Griswold Street, Suite 1325
Detroit, MI  48226
(313) 963-5310 (office)
rfkinney@sbcglobal.net

Dated: January 22, 2025